CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 17 2016

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| VICTORIA JENKINS,<br>individually and on behalf of all others<br>similarly situated,<br><br>　　　　Plaintiff,<br><br>v.<br><br>F. GLENN AYLOR, et al.,<br><br>　　　　Defendants. | Civil Action No. 3:15-CV-00046<br><br>**MEMORANDUM OPINION**<br><br>By: Hon. Glen E. Conrad<br>Chief United States District Judge |

Plaintiff Victoria Jenkins, individually and on behalf of all others similarly situated, filed this action against defendants Superintendent F. Glenn Aylor, Central Virginia Regional Jail Authority (the "Authority"), and several employees at the Central Virginia Regional Jail ("CVRJ"), alleging that they were deliberately indifferent to her serious medical condition by denying her access to her medications. The case is presently before the court on defendants' motion to dismiss and motion to strike portions of the complaint. For the following reasons, the court will grant in part and deny in part the motion to dismiss and will deny the motion to strike.

### Factual Background

The following facts, taken from plaintiff's complaint, are accepted as true for purposes of the motion to dismiss. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

### I.　Jenkins' Experience at CVRJ

On October 18, 2014, Jenkins was detained at CVRJ pending trial on three felony charges in the Circuit Court of Madison County, Virginia. At all relevant times, Jenkins suffered from a number of psychiatric ailments, including anxiety, depression, and bipolar disorder. She took

several medications to treat these conditions, namely Trazondone, Lexapro, and Xanax. According to the complaint, the "medications successfully managed Jenkins'[] symptoms and allowed her to function normally." Compl. ¶ 16. However, Jenkins was required to take the medications regularly in order to maintain this effect.

At the time of her arrest, Jenkins asked the arresting officers for permission to retrieve her medications from her purse before being transported to CVRJ; the officers denied this request. When she arrived at CVRJ, she informed the staff of her psychiatric conditions and her need for medications. In response to Jenkins' repeated requests, defendant Jasmine Buckner-Jones, a nurse at CVRJ, laughed and said, "You'd better get used to it. You're not getting the medication your doctor prescribed." Id. ¶ 26. Buckner-Jones also accused Jenkins of faking her conditions in order to get her medications for recreational use and told Jenkins that she could only receive medications that were prescribed by a doctor at CVRJ. However, defendants did not bring Jenkins to see a doctor in order to obtain her medications.

Within a day or two after her arrival at CVRJ, Jenkins met with her attorney, David Deal, who observed her to be "lucid and able to effectively participate in their conversation." Id. ¶ 35. Jenkins also called her sister, Robin, several times and asked Robin if she could bring Jenkins' medications to CVRJ. Jenkins told Robin that CVRJ staff was refusing to allow her access to her medications. Robin then spoke to Buckner-Jones and defendant Amanda Pitts, another nurse at CVRJ, who told Robin that they "hadn't had time to get [the medications] to [Jenkins] yet." Id. ¶ 29. Robin also called Jenkins' doctor, who instructed CVRJ staff to give Jenkins her medications. However, Pitts informed Robin that CVRJ would not distribute Xanax to Jenkins, despite her doctor's instructions. Thereafter, Robin brought Jenkins' medications, with the exception of Xanax, to CVRJ.

2

A few days later, Jenkins' other sister, Bonnie Coffey, spoke to Pitts on the phone, who said that Jenkins had received her medications. However, according to the complaint, defendants still refused to give Jenkins her medications. Deal again visited Jenkins at CVRJ, but she did not recognize him and asked him to leave. This time, Jenkins was "disheveled, malodorous, and did not appear to be in touch with reality." Id. ¶ 36. Jenkins' family members also came to CVRJ every week to see her, but she refused to see them. This was "drastically out of character for Jenkins, and the news alarmed [her] family." Id. ¶ 37.

On October 29, 2014, Jenkins appeared before the Madison County Circuit Court for a bail hearing. However, she refused to enter the courtroom or speak with her attorney, so the court cancelled the hearing. Prior to the hearing, family members saw Jenkins in a wheelchair. She was "very pale," "catatonic," and her hair was "knotted and matted." Id. ¶ 39. Jenkins was also unresponsive when her family members attempted to get her attention outside of the courthouse.

On November 4, 2014, Coffey and Ruby Reid, Jenkins' mother, went to CVRJ and asked to speak with Superintendent F. Glenn Aylor in order to figure out why Jenkins refused to see them. Aylor sent a woman named "Ms. Deane" to speak to them. Id. ¶ 40. Ms. Deane told Coffey and Reid that Jenkins was in "bad shape" and needed to go to the hospital for treatment. Id. Ms. Deane indicated that they would need to get a court order to send Jenkins to a hospital.

By November 7, 2014, Jenkins was "paranoid, delusional, and divorced from reality." Id. ¶ 41. She believed that she was being "watched through the wall in her cell[,] … refused to eat, and was urinating and defecating on the floor of her cell." Id. Jenkins was then transported to Western State Hospital for treatment. When family members visited Jenkins at the hospital, she was still delusional, but did recognize them this time. However, Jenkins also believed that her dog was in her room at the hospital and would repeatedly "pick[] up" the dog and kiss it. Id. ¶

3

Hospital staff told Jenkins' family members that Jenkins was off her medications for a while, and that it would take weeks before she would return to normal. During her stay at the hospital, Jenkins was provided with psychiatric medications. Her condition gradually improved.

The hospital discharged Jenkins on December 3, 2014, and she returned to CVRJ. Upon her return, Buckner-Jones asked Jenkins whether she had "enjoyed her trip." From then on, CVRJ staff gave Jenkins her medications, and her mental condition remained stable. When Jenkins asked a CVRJ staff member why she was not given her medications prior to her hospitalization, the employee, identified in the complaint as "Ms. Kidwell," said that "we didn't have the funding at the time[,]" and that she "wanted to send [Jenkins] offsite, but we didn't have the funding for it." Id. ¶ 49. Jenkins was released from CVRJ on August 6, 2015 after a jury acquitted her on two charges, and the prosecutor entered a nolle prosequi on the third charge.

The complaint alleges that, at the time of Jenkins' detention, CVRJ had written policies and procedures in place for inmates who required regular medications. Specifically, if an inmate had the medication on her person at the time of intake, the policies required CVRJ staff to refer her to the medical department. If an inmate did not have the medication on her person, the policies instructed CVRJ staff to see if a family member could bring the medication to CVRJ or, in the alternative, refer the inmate to the medical department. In the event that the medication was not on hand at CVRJ, CVRJ staff must obtain the medication from outside CVRJ through specific procedures. These procedures included procurement of the medication from a licensed pharmacy with a valid prescription from the CVRJ medical department, distribution of the medication in accordance with a physician's orders, and recordation of the time and number of doses provided to the inmate. The policies also provided that "[m]edication shall be administered to the individual pursuant to telephone, verbal, standing or direct orders." Id. ¶ 20(5).

4

## II.    Other Inmate's Experience at CVRJ

In addition to the circumstances surrounding Jenkins' detention, the complaint describes a "pattern and practice of deliberate indifference to inmates' medical needs" at CVRJ. Id. ¶ 50.

### a.    *Shawn Berry*[1]

On August 7, 2014, Berry was arrested by deputies from the Orange County Sheriff's Department on outstanding warrants. At the time of his arrest, Berry had been addicted to alcohol for over twenty years and heroin for about ten years, and he informed the deputies that he would experience severe withdrawal in jail. Berry's girlfriend also told the deputies that Berry would experience withdrawal symptoms in jail, and that he had to be placed in intensive care the last time he went to jail.

While in custody at CVRJ, Berry began to experience severe withdrawal symptoms. Other inmates at CVRJ requested medical assistance for Berry on a number of occasions. Nevertheless, CVRJ staff would sometimes ignore these requests entirely. At other times, Pitts and others told the inmates that if Berry did not personally approach the window to ask for medical assistance, he would receive none. The inmates advised CVRJ staff that Berry was too sick to leave his bunk. When the inmates offered to bring a food tray to Berry, because he was too sick to retrieve his own, CVRJ staff refused. The medical staff at CVRJ—including defendant Christie Apple-Figgins, a nurse at CVRJ,[2] and Buckner-Jones—did provide Berry with medication and Gatorade, took his vitals, and monitored his condition. Officers at CVRJ also assisted Berry on several occasions, namely when he fell out of his bunk, could not stand in

---

[1]        The court has summarized the facts regarding this individual's treatment at CVRJ in the related case of Thornhill v. Aylor, No. 3:15-CV-00024.  Accordingly, the court will outline only the information relevant to the instant motions.

[2]        In her complaint, Jenkins referred to Apple-Figgins as "Christine." However, defendants contend that Apple-Figgins' first name is actually "Christie."

5

the shower, and soiled his jumpsuit. Over the course of two days, Berry's health deteriorated, and he passed away on August 9, 2014.

At the time of Berry's death, CVRJ had written policies and procedures for treating inmates suffering from alcohol and heroin withdrawal. However, the complaint alleges that the medical staff did not follow CVRJ's internal protocols for alcohol and heroin withdrawal when they treated Berry.

### b. *Inmate A*

In 2006, an individual referred to in the complaint as "Inmate A," suffered a back injury that required him to take both pain medication and muscle relaxers. At first, CVRJ staff refused to give Inmate A any medication. Eventually, Inmate A was able to obtain pain medication, which he received anywhere between six hours to two weeks after his requests. At the time, Inmate A also suffered from Crohn's disease, which was aggravated by medications that contained ibuprofen or aspirin. Although CVRJ staff knew of Inmate A's condition, he received unidentified pain medications that aggravated his Crohn's disease. Medical staff, however, refused to verify the types of pain medications that Inmate A received.

In addition, the complaint describes an incident in which a correctional officer held Inmate A down on the floor and repeatedly drove his knee into Inmate A's rib cage and lower sides. Shortly after, Inmate A began bleeding from his rectum. He did not receive medical attention despite at least two requests for help from the correctional officers.

### c. *Inmate B*

Another inmate, known as "Inmate B," was incarcerated at CVRJ in 2005. At the time, Inmate B was prescribed three different psychiatric medications. Each medication required that he take one dose in the morning and one dose at night. However, CVRJ staff gave Inmate B both

6

doses of two of his medications in the morning and both doses of his third medication in the evening. According to the complaint, Inmate B also witnessed CVRJ staff give another inmate's medication with water, although the directions specified that the pill was not supposed to be taken with water. Finally, Inmate B alleges that CVRJ staff was consistently late with distributing pills in the evening, which caused several inmates to experience withdrawal symptoms as a result.

### d. *Inmate C*

A third inmate, "Inmate C," was incarcerated at CVRJ in 2011. Inmate C is an elderly man who, at the time of his detention, took two prescription medications for high blood pressure and two prescription medications for gout. However, CVRJ staff refused to allow Inmate C to take his medications. Three to four days after his release, Inmate C visited his doctor, who told Inmate C that he had a high risk of stroke because he did not take his medications while at CVRJ.

### e. *Former CVRJ EMT*

The complaint also alleges additional mistreatment towards inmates as witnessed by a licensed EMT, who worked at CVRJ for three months beginning in April of 2014. First, the complaint states that Pitts reprimanded the EMT for sending inmates to offsite emergency rooms because of the high cost of each visit. In one instance, an inmate suffered repeated head injuries during a fight. The EMT suggested that the inmate be sent to the emergency room for a CT scan. However, either Pitts or Apple-Figgins talked the inmate out of going to the hospital, and then reprimanded the EMT for her suggestion. On another occasion, an inmate attempted suicide. The EMT urged that the inmate be sent off-site for psychiatric treatment. Instead, the EMT was reprimanded, and the inmate received no treatment. Second, CVRJ never provided the EMT with

7

manuals or rules for treating inmates. Third, the EMT believes that it often took two to three days for inmates to receive basic medications, such as Tylenol. Fourth, the complaint alleges that CVRJ regularly refused to treat inmates for opiate withdrawal. Fifth, the EMT asserts that the dentist at CVRJ regularly worked on inmates without numbing them first. Sixth, the EMT reports that the conditions for female inmates at CVRJ were "appalling" because they were "crammed into one of two cells, which were disgusting and stank." Id. ¶ 135. Seventh, the EMT notes that the general attitude at CVRJ was that the inmates were considered "scum." Id. ¶ 136. Finally, the EMT alleges that, when she confronted Aylor about the inhumane treatment of the inmates, Aylor responded, "Please stay. You'll be just like the rest of the staff in a few months." Id. ¶ 138.

In light of these allegations, Jenkins contends that the Authority and Aylor created and facilitated a "culture of deliberate indifference to inmates' serious medical needs[.]" Id. ¶ 139.

### Procedural History

On August 28, 2015, Jenkins filed a class action complaint against defendants. The complaint names five defendants: Aylor; the Authority; and Apple-Figgins, Bucker-Jones, and Pitts (collectively, the "Medical Defendants"). In the complaint, Jenkins asserts the following claims: equitable relief under 42 U.S.C § 1983 against the Authority on behalf of herself and the proposed class (Count I); damages under 42 U.S.C. § 1983 against all defendants on behalf of herself (Count II); and negligence against all defendants on behalf of herself (Count III). Jenkins seeks compensatory damages in an amount no less than $2.15 million from the defendants deemed to be "health care providers" pursuant to Virginia Code § 8.01-581.15; compensatory damages in an amount to be determined at trial, but no less than $10 million, from all other defendants; punitive damages in an amount no less than $350,000.00; and attorneys' fees and costs. On January 19, 2016, defendants filed a motion to dismiss the complaint pursuant to Rules

8

12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and a motion to strike portions of the complaint pursuant to Rule 12(f). The court held a hearing on the motions on March 23, 2016. The motions have been fully briefed and are ripe for disposition.

## Standard of Review

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to move for dismissal of an action for lack of subject matter jurisdiction. The plaintiff bears the burden of proving that subject matter jurisdiction exists, Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999), and must establish standing to bring the claims asserted in the complaint before the court may decide the merits of such claims, Allen v. Wright, 468 U.S. 737, 750 (1984).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. To survive dismissal for failure to state a claim, a plaintiff must establish "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In ruling on a 12(b)(6) motion, all well-pleaded allegations in the complaint are taken as true and all reasonable factual inferences are drawn in the plaintiff's favor. Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). However, "[a]t bottom, a plaintiff must 'nudge [her] claims across the line from conceivable to plausible' to resist dismissal." Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 364-65 (4th Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The complaint must contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 555, 570. Although a complaint need not contain detailed factual allegations, it must contain more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do." Id. at

9

555. In considering a Rule 12(b)(6) motion, the court may consider exhibits attached to or referred to in the complaint. See Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999).

**Discussion**

## I.   Motion to Dismiss

Defendants move to dismiss Count I, Count II against Aylor and the Authority, and Count III under the theory of simple negligence. The court will consider each count in turn.

### a.  Count I

Under Count I, Jenkins alleges that the Authority acted with deliberate indifference to inmates' serious medical needs by failing to enforce it own written policies for medical treatment of inmates, creating or condoning unwritten policies that allowed for refusal of medical care, and prioritizing saving money over providing basic medical care, in violation of 42 U.S.C. § 1983. Defendants contend that the court should dismiss Count I pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure because Jenkins does not have standing to pursue injunctive relief individually and on behalf of the class, as she is no longer incarcerated at CVRJ. Jenkins concedes that she is unable to serve as class representative because she is no longer an inmate at CVRJ, making her individual claim for equitable relief moot. See Sosna v. Iowa, 419 U.S. 393, 402 (1975) (noting that, in the class action context, "[t]here must ... be a named plaintiff who has such a case or controversy at the time the complaint is filed"); see also Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007) (finding that an inmate's claim for injunctive or declaratory relief is moot when he is "no longer subject to the challenged policy, practice, or condition ... even if a claim for money damages survives"). Nevertheless, Jenkins asks the court to appoint a federal receiver to ensure defendants' compliance.

10

The court declines such request and concludes that Count I must be dismissed. A receivership is meant to "achieve compliance with a constitutional mandate" and serves as an "intrusive remedy which should only be resorted to in extreme cases." Shaw v. Allen, 771 F. Supp. 760, 762 (S.D.W. Va. 1990). Furthermore, it is "only a means to reach some legitimate end sought through the exercise of the power of a court of equity." Gordon v. Washington, 295 U.S. 30, 39 (1935). For example, in Shaw, the district court entered a comprehensive order enjoining the defendants from operating their jail in violation of the United States Constitution and the state constitution. 771 F. Supp. at 761. After plaintiffs filed a petition for contempt, the district court appointed a receiver to operate the jail in compliance with the Court's previous order. Id. at 764.

Here, there has been no finding of liability against defendants. As such, any request for appointment of a receiver is premature and irrelevant for purposes of the instant motion. Therefore, the court believes that Count I is moot as Jenkins has no standing to pursue a claim of injunctive relief individually and on behalf of a proposed class. Accordingly, the court will grant defendants' motion to dismiss as to Count I.[3]

### b. **Count II**

Under Count II, Jenkins seeks damages from all defendants under 42 U.S.C. § 1983 based on their alleged deliberate indifference to her serious medical needs in denying her access to her psychiatric medications. Defendants move to dismiss this count solely as to claims made against the Authority and Aylor. Specifically, defendants argue that the complaint fails to state claims under § 1983 against the Authority and Aylor, and that Aylor is entitled to qualified

---

[3] In the event that the court were inclined to grant defendants' motion to dismiss with respect to Count I, Jenkins asks for the count to be dismissed without prejudice, in case discovery reveals an alternative class representative with standing. As such, the court will dismiss Count I without prejudice.

11

immunity.

To state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Jenkins argues that defendants violated her rights under the Due Process Clause of the Fourteenth Amendment.[4] In the Fourth Circuit, deliberate indifference to a pretrial detainee's serious medical need violates the Fourteenth Amendment. Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992). In addition, "[f]or federal constitutional purposes, a serious medical need includes a serious psychiatric need." Schiesser v. Wexford Health C.M.S. Corizon, No. AW-12-CV-2795, 2013 WL 4049723, at *4 (D. Md. Aug. 8, 2013) (citing Gibson v. Cty. of Washoe, Nev., 290 F.3d 1175, 1187 (9th Cir. 2002)); see also Bowring v. Godwin, 551 F.2d 44, 47 (4th Cir. 1977) ("We see no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart."). Therefore, the court finds that the complaint alleges a plausible constitutional right.

### i. *Municipal Liability*

Jenkins argues that there was a policy or custom at CVRJ of deliberate indifference to inmates' serious medical needs in violation of § 1983. Specifically, the complaint states that both the Authority and Aylor fostered a "culture of deliberate indifference to inmates' serious medical

---

[4]    Plaintiff also alleges that the defendants' conduct violated her rights under the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). However, because it appears that Jenkins was a pretrial detainee at the time of the events in question, the Eighth Amendment does not apply. Instead, her claims arise solely under the Due Process Clause of the Fourteenth Amendment. See Riley v. Dorton, 115 F.3d 1159, 1166 (4th Cir. 1997). Nonetheless, a pretrial detainee's rights are "co-extensive" with a convicted prisoner's rights under the Eighth Amendment. Turner v. Knight, 121 F. App'x 9, 13 (4th Cir. 2005) (citing Hill v. Nicodemus, 979 F.2d 987, 990-92 (4th Cir. 1992)).

12

needs, constituting a pattern and practice of violation of inmates' civil rights." Compl. ¶ 139.[5]

Local governing bodies may be sued directly under § 1983 for monetary, declaratory, or injunctive relief when an unconstitutional act "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 690 (1978). This standard, however, is not akin to respondeat superior liability. City of Oklahoma City v. Tuttle, 471 U.S. 808, 818 (1985). In addition, municipal entities may be liable if a governmental "custom" causes a constitutional violation, even if the custom was not formally approved by the entity. Monell, 436 U.S. at 690. In order to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must plausibly allege (1) the existence of an official policy or custom, (2) that is fairly attributable to the municipal entity, and (3) proximately caused the underlying constitutional violation. Jordan ex rel. Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994). At the motion to dismiss stage, "[t]here is no requirement that [plaintiff] detail the facts underlying his claims, or that he plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." Jordan ex rel. Jordan, 15 F.3d at 339.

The first inquiry in this analysis is whether the complaint plausibly states an official policy or custom. A plaintiff may identify an official policy in three ways: (1) written ordinances and regulations, (2) certain affirmative decisions of policymaking officials, or (3) certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens. Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) "[O]utside of formal

---

[5] Although Jenkins appears to allege both supervisory liability and municipal liability against Aylor, different legal principals govern each theory of liability. Dowdy v. Pamunkey Reg'l Jail Auth., No. 3:14-cv-003, 2014 WL 2002227, at *8 (E.D. Va. May 15, 2014). Therefore, the court will address Aylor's supervisory liability in the next section.

Case 3:15-cv-00046-GEC   Document 26   Filed 05/17/16   Page 13 of 25   Pageid#: 309

decisionmaking channels, a municipal custom may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." Id. (internal quotation marks omitted). Jenkins does not allege that any formal, written policy caused her constitutional violations, as the complaint provides that CVRJ had formal policies in place at the time of her detention that required staff to distribute an inmate's medication under certain conditions. Instead, Jenkins argues that both the Authority and Aylor "refused to enforce compliance with CVRJ's written policies governing inmate medical care" and "created or condoned well-known informal policies designed to deny adequate medical care[.]" Compl. ¶ 140.

The court finds that the complaint contains sufficient factual allegations to support the claim that there was an official policy of deliberate indifference at CVRJ, specifically based on Aylor's inactions as its policymaker. "[D]eliberate indifference of a 'policymaker' may render liable both the official, in his individual capacity, and the municipal entity." Newbrough v. Piedmont Reg'l Jail Auth., 822 F. Supp. 2d 558, 585 (E.D. Va. 2011). In order to attribute an official's actions to the municipality, a plaintiff must plausibly allege that the official was a policymaker for the purposes of § 1983. In order words, the plaintiff must plead facts from which the court can reasonably infer that the official's "edicts or acts may fairly be said to represent official policy." Monell, 436 U.S. at 694. "Policymaking authority" means "authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 481-84 (1986)). The most critical factor is not "the practical finality of an official's 'acts and edicts,' but their 'policy' nature." Id. (quoting Pembaur, 475 U.S. at 480).

14

In this case, the court finds that the complaint plausibly alleges that Aylor was a policymaker at CVRJ, and defendants do not contend otherwise. The complaint asserts that Aylor had the "ultimate power and control over the medical care and attention, if any, provided to the inmates at CVRJ" and that he "created and facilitated a culture of deliberate indifference to inmates' serious medical needs[.]" Compl. ¶¶ 5, 139. Jenkins' characterization of Aylor's authority at CVRJ borders on conclusory and, thus, need not be accepted as true. See Newbrough, 822 F. Supp. 2d at 586 (finding that plaintiff stated a plausible claim that the jail's superintendent was its policymaker because the superintendent oversaw the "creation and implementation of [the jail's] policies, procedures, and customs with regard to the provision of medical care"). However, at this stage in the ligation, the court can reasonably infer that, as CVRJ's highest-ranking officer, Aylor's acts and edicts constituted official policy at the jail. Id.

The court also concludes that Aylor's alleged inactions constituted deliberate indifference to inmates' serious medical needs. First, the complaint alleges that Aylor prioritized finances over providing adequate medical care to inmates. Second, Aylor took no action when he was contacted directly by Jenkins' family members regarding her lack of medication. Third, when the former EMT confronted Aylor about the inhumane treatment of inmates, he simply said that she should stay and would soon act like the rest of the staff. Fourth, Aylor did not enforce compliance with CVRJ's internal written policies governing inmate medical care. Specifically, on multiple occasions, CVRJ staff refused to administer an inmate's medication, despite a doctor's orders, or to refer the inmate to the medical department.

Although the complaint does not explicitly allege that Aylor failed to adequately train his employees, an entity may have a "policy of not taking reasonable steps to train its employees" when the "need for more or different training is so obvious[.]" City of Canton v. Harris, 489 U.S.

15

378, 390 (1989). Here, the former EMT provided that she was not given any manuals or rules regarding the treatment of inmates' medical needs. Furthermore, based on the Medical Defendants' inadequate response to Jenkins' serious psychiatric needs, the complaint arguably alleges the existence of an "obvious" need for improved training at CVRJ. Such an alleged failure also states a viable claim of deliberate indifference on Aylor's part as the policymaker for CVRJ. Therefore, the court believes that a fair reading of the complaint supports claims of deliberate indifference to inmates' serious medical needs both to Aylor, in his individual capacity as policymaker for the CVRJ, and to the Authority, such as to survive the motions to dismiss.

Even if the court could find that the complaint does not sufficiently allege a policy of deliberate indifference at CVRJ, the court believes that the complaint also cites sufficient facts in support of the argument that there was a custom of deliberate indifference to inmates' serious medical needs at CVRJ. A custom may be attributable to a municipality when the "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." Newhard v. Borders, 649 F. Supp. 2d 440, 446 (W.D. Va. 2009) (Moon, J.). Actual knowledge may be shown by "recorded reports to or discussions by a municipal governing body." Id. at 446 n.4. Constructive knowledge may be shown with facts that the practices have been so "widespread and flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." Id.

Although a "meager history of isolated incidents" does not establish a custom, Carter, 164 F.3d at 220, the complaint contains a number of alleged instances of deficient medical care at CVRJ, evidenced by both the events surrounding Jenkins' detention and the alleged mistreatment of other inmates who required regularly administered medications. The allegations

16

in this case are not "scattershot accusations of unrelated constitutional violations" but, instead, all relate to deficient medical care at CVRJ, specifically the inadequate distribution of medications to inmates, in violation of the Fourteenth Amendment. <u>Carter</u>, 164 F.3d at 218. In addition to the allegations surrounding Jenkins' treatment, the complaint alleges that Inmate A required pain medication after suffering a severe back injury, but CVRJ staff initially refused to provide him with any pain medication. When CVRJ staff eventually did provide Inmate A with medication, it was anywhere from six hours to two weeks after his requests. Moreover, Inmate A was given unidentified, loose pills, despite CVRJ staff's knowledge that certain medications would exacerbate his Crohn's Disease. Similarly, the complaint alleges that Inmate B required three psychiatric medications twice a day, once in the morning and once in the evening. However, CVRJ staff did not distribute his pills according to this schedule, but instead gave him two doses of two medications in the morning and two doses of his third medication at night. In addition, Inmate B alleges that CVRJ staff was consistently up to four hours late for evening pill distributions, causing inmates to suffer withdrawal symptoms as a result of the delay. Moreover, according to the complaint, Inmate C was taking four prescribed medications at the time of his arrival at CVRJ for high blood pressure and gout. Nevertheless, CVRJ staff refused to allow Inmate C access to his medications during his detention. Finally, the former EMT contends that it would often take two or three days for inmates to receive basic medications, like Tylenol.

Based on the allegations in the complaint, the court concludes that the complaint plausibly states that there was a custom at CVRJ of denying inmates access to their medications, even if the inmates had a prescription prior to their arrival at CVRJ. Moreover, in situations where CVRJ staff did provide inmates with their medications, there appeared to be a custom of not distributing the medication in accordance with doctor's orders, which presumably covered

17

the time and manner of dosages, despite the explicit policies at CVRJ requiring staff to do so. This custom was apparent in the experiences of Jenkins, Inmate A, Inmate B, Inmate C, and the former EMT. To the extent that defendants argue that Jenkins' claims against the Authority should be dismissed as she received adequate treatment once she returned from the hospital, the Fourth Circuit has held that a delay in medical treatment can support a claim of deliberate indifference. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). Most importantly, the complaint provides instances when Aylor was personally aware of deficient medical care provided to inmates, constituting actual knowledge of the custom. As such, the court finds that the complaint also plausibly alleges a custom of deliberate indifference at CVRJ.

Next, "[i]t is not enough to identify a policy or custom of deliberate indifference; [p]laintiff must also allege that the policy or custom proximately caused the instant constitutional injury." Newbrough, 822 F. Supp. 2d at 584. The policy or custom must be "the moving force of the constitutional violation specifically charged." Milligan v. City of Newport News, 743 F.2d 227, 230 (4th Cir. 1984) (internal quotation marks omitted). There is a causal connection between a policy or custom and the specific constitutional violation if the violation was made "reasonably probable by permitted continuation of the custom[.]" Spell, 824 F.2d at 1391.

In this case, the court finds that the complaint alleges sufficient facts to conclude that a policy or custom of deliberate indifference at CVRJ proximately caused Jenkins' constitutional violations. Specifically, "there is a logical and natural connection between a policy or custom of deficient medical care and an instance of inadequate medical care." Newbrough, 822 F. Supp. 2d. at 585. Again, Jenkins has sufficiently alleged an official policy or custom of deficient medical care at CVRJ, particularly with its distribution of medications to inmates. The court finds that there is a logical and natural connection between these allegations and the instances

18

when Jenkins received allegedly deficient medical care in violation of the Fourteenth Amendment. For purposes of the motion to dismiss, it is therefore reasonable for the court to conclude that the policies or customs of deliberate indifference at CVRJ were the moving forces behind the alleged violations of Jenkins' constitutional rights.

Viewing the facts in a light favorable to Jenkins, the court finds that she has plausibly shown that there was an official policy or custom of deliberate indifference to inmates' serious medical needs at CVRJ, which violated her Fourteenth Amendment rights. Thus, at this stage in the litigation, the court concludes that she has stated plausible claims under § 1983 against both the Authority and against Aylor as policymaker of CVRJ. Accordingly, the court will deny defendants' motion to dismiss with respect to Count II under the theory of municipal liability.

### ii. *Supervisory Liability*

In addition to liability as the policymaker of CVRJ, the complaint also appears to assert that Aylor is liable under § 1983 in his individual capacity as the supervisor of CVRJ. See Compl. ¶ 65 ("[U]nder Aylor's command of CVRJ, it was (and remains) an impermissible drain on the budget of CVRJ and the CVRJ counties to provide proper medical care to CVRJ inmates."). A supervisor is not automatically liable for the misconduct of his employees under principles of respondeat superior, Monell, 436 U.S. at 694, but may be liable for "constitutional injuries inflicted by [his] subordinates" in certain circumstances, Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). Specifically, "continued inaction in the face of widespread abuses .... provides an independent basis for finding that [the official] was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." Id. To establish supervisory liability, a plaintiff must show (1) that "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable

risk of constitutional injury to citizens like the plaintiff"; (2) that the supervisor's response was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there existed "an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Shroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal citations and quotation marks omitted).

In this case, the court first finds that Jenkins has adequately alleged facts that, taken as true, give rise to the inference that Aylor had actual or constructive knowledge of inadequate medical care at CVRJ. She need not establish that Aylor had actual or constructive knowledge of the circumstances surrounding her treatment—although she has done so in her complaint—but simply the risk of harm to inmates like her. Newbrough, 822 F. Supp. 2d at 587. Jenkins alleges that, on at least two instances, Aylor was personally aware of deficient medical care to inmates. Thus, the court finds that the first prong of the Shaw test is satisfied.

For the second prong, Jenkins needs only to allege inaction by Aylor to support a reasonable inference of deliberate indifference. Here, the court may reasonably infer that Aylor was deliberately indifferent to instances when inmates received inadequate medical care, for the same reasons as outlined in the previous section regarding Aylor's liability as policymaker of CVRJ. The complaint goes beyond merely "pointing to a single incident or isolated incidents" to show Aylor's inadequate response. Slakan, 737 F.2d at 373. Instead, the complaint contains several instances where Aylor failed to take action to remedy the lack of medical care provided to inmates, showing "tacit authorization of offensive practices." Id.

Finally, for the same reasons stated in the municipal liability section, Jenkins has plausibly stated a causal nexus between the alleged practices at CVRJ and her constitutional injury. As superintendent of CVRJ, Aylor had ultimate authority and control over medical care

20

provided to inmates. It is reasonable to conclude that the deprivation of Jenkins' constitutional rights was a "natural and foreseeable consequence" of Aylor's approval of, or inaction towards, deficient medical care provided to Jenkins.  Newbrough, 822 F. Supp. 2d at 587.

### iii. *Qualified Immunity*

Defendants argue that, even if Jenkins has pled plausible claims of deliberate indifference, Aylor is entitled to qualified immunity. Government officials are entitled to qualified immunity from civil liability for performing discretionary functions only insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a government official is entitled to qualified immunity, the court must "(1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable official would have understood that the conduct at issue violated the clearly established right." Henderson v. Simms, 223 F.3d 267, 271 (4th Cir. 2000).

In this case, the constitutional right at issue is due process under the Fourteenth Amendment. As previously noted, it is clearly established that deliberate indifference to a pretrial detainee's serious medical need violates the Fourteenth Amendment. Gordon, 971 F.2d at 1094; see also Hill v. Nicodemus, 979 F.2d 987, 990 (4th Cir. 1992). Assuming the facts in the complaint, the court concludes that a reasonable official in Aylor's position would have understood that his actions or inactions violated Jenkins' constitutional rights. See Estate of Harvey ex rel. Dent v. Roanoke City Sheriff's Office, No. 7:06CV00603, 2007 WL 602091, at *6 (W.D. Va. Feb. 23, 2007) (Conrad, J.) (holding that qualified immunity was inappropriate where plaintiff sufficiently alleged deliberate indifference to an inmate's serious medical need

under the Fourteenth Amendment). Therefore, the court believes that qualified immunity is inappropriate at this stage of the litigation. In sum, the court finds that Jenkins has stated plausible claims under § 1983 against the Authority and Aylor. Accordingly, the court will deny the motion to dismiss with respect to Count II.

### c.  Count III

In Count III of the complaint, Jenkins alleges that defendants were negligent in failing to provide treatment to Jenkins for her serious medical needs. She also contends that defendants' actions amounted to gross negligence. In moving to dismiss this count, defendants argue that they are entitled to sovereign immunity.

It is well-established that state officials and municipal corporations are not entitled to sovereign immunity when they are accused of an intentional tort or acts constituting gross negligence. See, e.g., Coppage v. Mann, 906 F. Supp. 1025, 1047 (E.D. Va. 1995); Burnham v. West, 681 F. Supp. 1169, 1172 (E.D. Va. 1988); Nat'l R.R. v. Catlett Volunteer Fire Co., Inc., 404 S.E.2d 216, 219 n.2 (Va. 1991); Tomlin v. McKenzie, 468 S.E.2d 882, 884 (Va. 1996). Again, by plausibly establishing claims of deliberate indifference, Jenkins has alleged more than simple negligence against defendants. See Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) (finding that the standard for deliberate indifference is "very high" and "a showing of mere negligence will not meet it"). Therefore, the court is unable to conclude that defendants are entitled to sovereign immunity at this stage in the proceedings. Accordingly, the court will deny the motion to dismiss with respect to Count III of the complaint.

In sum, the court will grant defendants' motion to dismiss as to Count I of the complaint but will deny the motion as to Counts II and III.

22

## II.  Motion to Strike

Defendants also move to strike certain portions of the complaint, which they argue are immaterial and impertinent to the instant action. Specifically, they seek to remove the word "torture" from paragraphs 1, 7, 8, 9, and 10 of the complaint and the phrase "spate of inmate deaths" from paragraph 2 of the complaint.

Rule 12(f) allows the court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Information is "immaterial" for the purposes of Rule 12(f) if it has "no essential or important relationship to the claim for relief or the defenses being pleaded[.]" 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1382 (3d ed. 2004); Smalls, 2015 WL 7162970, at *3. An "impertinent" matter does not "pertain, and [is] not necessary, to the issues in question." Smalls, 2015 WL 7162970, at *3 (quoting Wright & Miller, supra).

The court should use Rule 12(f) sparingly, as motions to strike are generally viewed with disfavor. Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001). As such, a motion to strike should only be granted when the allegations have "no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action." Bailey v. Fairfax Cty., No. 1:10–cv–1031, 2010 WL 5300874, *4 (E.D. Va. Dec. 21, 2010) (quoting Wright & Miller, supra); see also Augustus v. Bd. of Pub. Instruction of Escambia Cty., Fla., 306 F.2d 862, 868 (5th Cir. 1962) ("[A motion to strike] is a drastic remedy to be resorted to only when required for the purposes of justice [and] should be granted only when the pleading to be stricken has no possible relation to the controversy."). Furthermore, "[a] disputed question of fact cannot be decided on motion to strike." Id. In such circumstances, the court should "defer action on the motion and leave the

23

sufficiency of the allegations for determination on the merits." Id. Thus, the movant under Rule 12(f) faces a "sizeable burden." Clark v. Milam, 152 F.R.D. 66, 70 (S.D.W. Va. 1993).

In the instant case, defendants first argue that the word "torture" should be stricken from the complaint, as Jenkins' allegations of deliberate indifference and negligence do not require proof of torture or sadistic intention to harm her. The court believes that such language does pertain to the issues in question, namely whether defendants were deliberately indifferent to Jenkins' serious medical need. In Estelle v. Gamble, the United States Supreme Court stated that, when inmates' medical needs are not met, such failure can produce "physical torture or a lingering death." 429 U.S. 97, 103 (1976) (internal quotation marks omitted). In her complaint, Jenkins argues that defendants tortured her by denying her to access to her psychiatric medications. Although a showing of torture is not necessary to establish a claim of deliberate indifference, the court is not persuaded that such language has no possible relation to whether defendants were deliberately indifferent to Jenkins' serious medical need. Deliberate indifference requires a subjective showing that a defendant knew of a serious risk of harm to an inmate, and that his or her actions were inappropriate in light of that risk. Certainly, if a defendant were to engage in active torture of an inmate by denying her medical care, that situation would satisfy this standard under a worst case scenario. Although the court is not persuaded that such a scenario is present in this case, the court declines to decide the merits of this allegation—at this stage in the litigation—through a motion to strike.

Moreover, defendants argue that Jenkins' complaint only provides that there was one death at CVRJ, which contradicts the allegation of a "spate" of inmate deaths, and that such fact is not relevant to her claims. The court believes that such language is relevant to Jenkins' claims, specifically those against Aylor and the Authority. First, this portion of the complaint is pertinent

24

to establishing liability against Aylor, as both policymaker and supervisor at CVRJ. The complaint contends that Aylor was ousted as superintendent of CVRJ because of a "spate of inmate deaths and serious medical crises[.]" Compl. ¶ 2. If proven, such allegation may establish the extent of Aylor's knowledge as to the deficient medical treatment provided to inmates at CVRJ, as well as whether his inactions constituted deliberate indifference to inmates' serious medical needs. Moreover, such allegation is also pertinent to the claims against the Authority. If proven, this allegation may show that the Authority had actual or constructive knowledge of a persistent and widespread practice among its employees in providing constitutionally deficient medical care to inmates. Although the complaint alleges only one death at CVRJ, the court notes that this case is in the early stages, and the parties have not engaged in full discovery as to what the Authority, Aylor, and the Medical Defendants knew at the time of Jenkins' detention.

While this specific language in the complaint may be inflammatory and offensive to defendants, the court is unable to find that the allegations have no possible relation or logical connection to the action, or cause significant prejudice to defendants. Accordingly, the court will deny defendants' motion to strike portions of Jenkins' complaint.

## Conclusion

For the foregoing reasons, the court will grant in part and deny in part defendants' motion to dismiss. Count I will be dismissed without prejudice, and Counts II and III will proceed against all defendants. The court will also deny defendants' motion to strike.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This ____ day of May, 2016.

_____
Chief United States District Judge

25